Secretary, U.S. Department of the Interior, et al., Blackfeet Headwaters Alliance, et al. Appellants, Mr. Toth for federal appellants, Mr. Presso for intravenous appellants, and Mr. O'Donnell for re-appellate. Mr. Toth. Mr. Chief Judge, and may it please the Court. The District Court here committed two main errors concerning the merits of its review of the Secretary of the Interior's decision to cancel the mineral lease underlying plaintiff's mineral lease underlying the National Forest. First, the District Court failed to consider the express and stated reasons of the Secretary of the Interior in its actual cancellation decision. Secondly, specifically, the Secretary concluded that when the lease was originally issued, it violated the National Environmental Policy Act, or NEPA, as well as the National Historic Preservation Act, or the NHPA. Now, that failure to review the agency's actual state express reasons for its decision is contrary to fundamental principles of administrative law, and by itself is grounds for a remand. We would ask this Court to go further and actually review the agency's reasoning, as it can in any administrative review case, de novo on the administrative record, and hold that the Secretary of the Interior's reasons for determining that the original lease's issuance violated NEPA and the NHPA were rational and supported by the record. The second main error that the District Court committed on the merits was that it held, contrary to the record, that Interior both ignored and rejected out of hand plaintiffs' purported reliance interests. That conclusion was contrary to the record because plaintiffs' reliance interests were not so serious or substantial to require discussion under the FOX TV standard. But even if they were, the Secretary's cancellation decision adequately considered those interests, specifically by offering to refund the entirety of the rents paid not only by plaintiffs but by plaintiffs' predecessors in the lease. That amount totaled approximately what plaintiffs claimed were his expenses, nonlegal expenses. And so the Court's conclusion that reliance interests were not adequately considered was contrary to the record and also warrants reversal. Can I ask you, there's the lease and there's the application to drill. I'm trying to figure out if you don't have, if the application to drill is not to be granted for a lot of the reasons explained in your decision making, can there, how can you have a lease, because what's leased here is not really land. What's leased is sort of a right to access the minerals underneath in this case. It's a mineral lease in terms of the lease itself. And so if you have a lease like that, then no application to drill, it could be granted. Can you still have the lease? They're treated as almost separate here, and I'm trying to figure out how the lease can operate if there can be no development of the minerals. In the facts of this case, I think that's correct, Judge Mallott. I believe that because the Secretary concluded in agreement with the Advisory Council on Historic Preservation that any development, any mineral development in this area would create an unmitigable cultural effect on the tribe's cultural district, that no permission to drill could, in fact, be granted for the lease. And I think that's why the Secretary both canceled the lease and denied the application for permission to drill in the same decision. But has Solonex or somewhere on the administrative record anyone suggested or made a representation as to how the lease could function if the minerals can't be developed? Or was it understood that these go hand in hand? I think this lease was issued back in the early 80s when there was a, and a lot of these leases did not include stipulations to protect surface occupancy throughout the entirety of the lease area. So had they, I'm trying to get to your question in a different way, but had Interior in the lease itself said, well, we're going to grant the lease but it's subject to not occupying the surface except for exploratory wells or exploratory drilling until you actually submit a proposal for application for permission to drill and we have more detail about where the surface impacts will occur and so forth and subject to our further NEPA review. And that's when we'll give you permission to occupy the entirety of the surface. That's not what it did here. It may do that in some leases. But the stipulations for these leases suffer from that flaw that Ms. Gordon-Peterson found to be fatal, which is that they don't prohibit surface occupancy throughout the entirety of the area. So I believe you're correct that they could not function apart from a drilling permit. There's just so much of the administrative action was on the applications to drill and not on the lease itself. And I was just curious about how that history developed that way. Yeah, I'm not sure about... The district court seemed to be surprised here about canceling the lease. And that's what I'm trying to understand. So I think you're right that they go, on the facts of this case, they go hand in hand. When you say the facts of this case, because... It did not contain any stipulations to prohibit surface occupancy. And so it essentially makes it... It makes the lease not worth very much if they can't drill anywhere. I mean, in other cases, maybe... Well, not worth very much. It's not the same thing as... The lease cannot... There can be no practical leasing. Because the lease, again, as I understand it, it's not a plan. I mean, land kind of goes along with it. But it's the right to extract minerals in a designated area. Right. No, I think I was just speaking a little too colloquially. I mean, what the Advisory Council on Historic Preservation found here was that any drilling or oil and gas development in this area would create unmitigable impacts to the tribe's cultural interests. And I think with that specific finding, with which the Secretaries of Agriculture and the Secretary of the Interior both concurred, that we do have a factual situation where drilling would not cure... A new application for drilling would not cure the defects in the original lease. Can I ask you about... When you started your remarks here this morning, you focused on the merits of the cancellation decision. I understood your... And you deal with that in your reply brief, too. But I understood your opening brief here to be asking us to reverse the district court on the reasons he gave, which was delay and reliance, and send the merits back to the district court. Is that true? Isn't that the... Did I misread your brief? We didn't specifically ask for remand. I mean, we put the NEPA arguments into our opening brief. The plaintiffs raised that as an alternative ground for affirming the district court. Instead of defending the district court's decision on its own terms, the plaintiff raises that NEPA noncompliance and says that's an alternative way of affirming it. But you're not telling us today. Are you asking us to deal with the merits? Suppose we agree with you on the delay and the reliance issues. What would you... Do you want this court to address the merits, or would it be better to send them back to the district court? We think this court should address the merits. Should? Yes. We think you're... Obviously, you're not compelled to. You have two choices. That's fine. Thank you. Well, we have to address their alternative grounds for affirmance. Yes. I believe so. I mean, that's what they would put forth. In addition to the merits, which I want to emphasize that the Department of the Interior found both violations of NEPA and the NHPA in the original issues of the lease, either of those constitutes a separate ground supporting the Secretary of the Interior's cancellation decision. As to NEPA, there were three separate grounds that... Wait. Can I pause over this? Do you know of a case that says we have to address alternative grounds that the district court did not address? I'm not aware of a case on that. I know you have authority to reach... It's a have-to part. Yeah. I'm struggling. As I stand here, I'm kind of struggling to puzzle it out whether you could ask the district court to rule on those issues in the first instance because, obviously, this court's in a better position to rule the reasoning of the judge. If they've opined on the question, it's a question of first impression. But I think this court has...  And this court certainly has the tools to decide these pure questions of law based on the record that the parties have presented here. It's de novo review of the administrative record as to the merits issue. As to the issue of whether the Secretary of the Interior has authority to cancel a lease, that's also a purely legal question, and there are arguments. I think this court should take the opportunity to squarely reject those arguments. Given the court's recent decision in the Silver State case, that applies the same legal principles of the Secretary's authority to manage the public lands, only not in the lease cancellation context, in the context of canceling a sale of the public lands, which would have been a transfer of the entirety of the fee and control out of the Secretary's hands. We think the logic of that decision and the Supreme Court's decision in Beauchesque make abundantly clear that there's this long line of statutes, which has a long historical pedigree, charging the Secretary of the Interior, and before him the Secretary of the Treasury, of supervising the management of the public lands. And so long as the Secretary retains control or authority of the fee title, he has authority to dispose of the title in the way he sees fit, subject to judicial review for arbitrariness, of course. Can you tell me when, where they were first put on notice, Solonix was first put on notice, or whoever was the owner at the time, I suppose, Fino or whoever's relevant, that the lease itself was at risk of being canceled?  I believe, I mean, the clearest notice came when the United States filed its position in the district court in November of 2015, I believe it was. That was at pages 254 to 260 of the Joint Appendix. That's our district court filing in November of 2015 to Solonix. Much earlier on, the flaws were made plain. It was as the NEPA compliance of the application for permission to drill, but that has to rely on or tier to the original EA. And that's what it was doing there. So it's sort of a nested reliance. Was that made explicit? I'm sorry? Was it made explicit that the NEPA, and I don't know how NHPA, analysis of the application to drill would also imperil the lease? I believe if you look back at the first administrative appeal decision by the Interior Board of Land Appeals, this is the IBLA decision from August of 1985 at pages 973 to 1006 in the Joint Appendix. I think it's going to make clear the way that IBLA adjudicated the administrative appeal that the flaws extended to the original EA, which was prepared for the lease as well. I see I'm running down out of time, and I'd like to reserve whatever I have left for Bob. Thank you. Good morning, Your Honor. This is Timothy Presso for the Intervenor Appellates. I appreciate the Court granting us an allocation of argument time. I'd like to use that time first with respect to Judge Millett's question. JA 1136 is the document from the mid-1980s in which my clients in this case raised the issue of the lease being illegal under the authority that had developed about the government's NEPA responsibilities in connection with federal oil and gas leasing. That's not the government saying that the lease is subject to cancellation, but it's a public protest of the lease's invalidity that dates back to the mid-1980s, and that issue persisted through the numerous subsequent approvals and has been in the record that this leaseholder inherited now approaching more than 30 years. The other point I'd like to make with my time this morning is that when we look back at this long line of case law supporting the enduring nature of the Interior Secretary's administrative cancellation authority, what we see is it's grounded in the Supreme Court's concern in cases like Knight v. United Land Association that the Secretary had to have the power to protect the public's interest in the public lands. And that concern is front and center in this case. The challenged lease cancellation decision protects an area that the Blackfeet tribe has described as its last traditional sacred territory. It's an area that offers important habitat for grizzly bears, elk, and numerous other sensitive species adjacent to Glacier National Park. The inconsistency of oil and gas development with those values is underscored by a host of enactments ranging from administrative and legislative mineral withdrawals to the designation of the traditional cultural district to the opinion of the advisory council here that made clear that oil and gas development on this lease would inflict such a severe blow to the Blackfeet tribe's cultural interest that their ability to practice their cultural traditions in this area would be lost. So for my clients, for our interest, the invalidity of this lease is critical to their ability to protect not only theirs but the larger public interest in this landscape adjacent to Glacier National Park. On the other side, Solonex has options to protect its economic interest. The Griffin and Griffin exploration case cited in our brief makes clear that even with a lawful cancellation of its lease by the secretary, Solonex has a contract claim in the federal court of claims against the United States for damages that it has sustained through investments and if it can prove expectation damages for this lease. So Solonex has options. There is no such safety net for the public interest in these lands, for the tribe's interest, and for my client's interest, and that's a very important consideration we ask the court. There were a lot of these leases that were canceled in the wake of the Conner decision and our decision. Do you know if anyone has had a successful case in the claims court for damages? Regarding those leases? Well, I see that my time has expired, so if you'll permit me. I do not know of any such claim. I would say this. The Griffin and Griffin case is relatively recent in the court of claims, and I think my assumption would be that a lot of leaseholders having had a lawful cancellation of their lease, for instance, by a federal court, as happened in the Bob Marshall case on remand, would not think they had a viable contract claim, but the Griffin and Griffin case makes clear they do, in fact, have such a claim. In the case of the Badger II medicine, in particular, the area we're talking about in this case, the lease relinquishments have occurred voluntarily to date, for the most part. There were the relinquishments that occurred after Congress established a mineral withdrawal in 2006 and provided tax incentives for relinquishment of leases. There was the large-scale Devon lease relinquishment that occurred about the same time this lease was canceled, in which Devon acknowledged that was, as they said, the right thing to do. There was the Moncrief lease cancellation that was challenged before this court, subject to a settlement recently, which I assume the court's seen some indication of that, but that was resolved amicably through a settlement. The only one that really, the only holdout issue in terms of a contest to the cancellation of the lease in this area is the controversy before the court here today. So I'm not sure we've kind of had the circumstances that would have presented that to the court of claims yet. Thank you. Thank you for the opportunity. I appreciate it. We ask you to reverse the district court, and to be clear, reverse on the merits, not remand. Thank you. Mr. McDonald. Thank you, Your Honor. David McDonald for the appellees. Appellants' decades-long delay in completing the review of Solonix's application for a permit to drill was so egregious that it required judicial intervention. Then, after the court forced their hand, appellants instead sidestepped the court's order and abruptly canceled Solonix's lease over a purported procedural defect more than 30 years old. This came as a surprise to Solonix because How is that sidestepping? I thought the court directed them to make a decision, and they made a decision. Because, Your Honor, the court directed them to make a decision on the suspension of the APD. Rather than coming to a conclusion on that mandamus lawsuit over the delay, they instead chose for the first time to hold that the lease was invalid, and that wasn't what they were directed to do. Well, the court doesn't have the authority to direct them to do one thing or another just to reach a decision. Right, Your Honor. The court set aside their decision as I'm talking about the court. Before that, yes. Before that. I'm not talking about, I understand your argument later, but it seems to me that they were ordered to make a decision, and they made a decision. They happened to be against you, but they made a decision. They didn't decide on the validity of the APD. They decided on the lease validity, which this is the first time they had ever expressed that concern. It actually goes direct opposite to what they had been stating for years continuously and explicitly. And despite appellant's attempts to minimize and trivialize the harms here, this cancellation after affirming its validity for 30 plus years is arbitrary and precious in violation of their delegated authority. Because whatever authority agencies may have to reconsider their decisions, that authority must be exercised within a reasonable period of time. And that's borne out by both this court's case law and Supreme Court's case law. Bocce v. Udall, which appellants rely on heavily for their claims of authority here, actually, in that case, the Supreme Court went out of its way to explain that the cancellation that it upheld was undertaken within the 30 days allowed for appeal. They remark about the reasonable time several times, and even warn future courts not to use this case as an excuse to allow agencies to abuse their authority. And this goes through to this court's case law as well, the Albertson v. FCC case. Also, the reconsideration was allowed because it was within the 20 days allowed for appeal. Or in Mazaletsky v. Trudeau, which while the court chose not to form a bright line rule for how long agencies have to reconsider, it did state that that time should be measured in weeks rather than years. And certainly not more than 30 years, as is the case here. And even more recently in the Ivy Sports Medicine case, this court quoted that language several times, discussed timely fashion, reasonable amount of time. And even in the Silver State case, which appellants, again, rely on fairly heavily, the reconsideration in that case occurred mere months after the initial decision. And it was immediately after the agency learned that they had been effectively defrauded by the party in that case. What do we do with the language in that case that says the secretary's authority to cancel an invalid land sale extends at least until the issuance of a land patent? It's a slightly different case because it's not a land patent. This is the lease. But I think in that case it's important. I think you just misunderstood Chief Judge Rowell's question. His question was that the agency can revoke the lease any time up until the patent. That was the question, I think. Of course, this isn't a patent case. All right. So what's the answer? The answer is that in that case and none of the other cases was the delay as significant as the delay here. All these cases are dealing with a reversal within the ordinary course as soon as they're made aware of a problem. These are all months, weeks, periods of time. This isn't an agency changing policy generation later and then reversing a 30-something-year-old decision. The facts of this case are so egregious that I think it takes it out of that area. Well, what do you do with our decision in Dayton Tire where we said that it's not the delay that makes something arbitrary and capricious. It's the consequences of the delay. A delay in and of itself, which is what the district court ruled, doesn't make something arbitrary and capricious. You have to look to see what the consequences are. Right. Do you agree with me? Yes, Your Honor. Okay. So therefore, the district court was wrong that delay in and of itself made this arbitrary and capricious, right? I don't think that's quite what the lower court. Oh, well, go ahead. I don't think that's quite what the lower court held. The lower court said it was delay and the delay was egregious. That's the largest, most obvious fact here. But it wasn't just the delay. It was the fact that the agencies have spent decades affirmatively stating that the lease was valid, both explicitly and implicitly. They did that throughout the 80s and 90s and through continuing processes up until 2015. There was no indication that the agencies considered the lease issuance invalid. That was only in 2015 when they first remarked that it might be in 2016 when they finally did so. So as we see, that's what we see in the association of David Cross. The ability to extract minerals from this land was very much in question throughout all that time period. Is that right? Yes, Your Honor. And can you explain to me how when you have a lease of mineral rights, if a determination is made that you cannot extract any minerals, that does not necessarily put you on notice that your lease is going to go away, too. Can you have the lease in any practical way without the right to drill or otherwise extract minerals? Yes, Your Honor. Because, again, like you stated, the issuance of the APD is a separate issue from the validity of the lease itself. And while in, say, today, the lease, okay, maybe there's no development opportunity now, technology is developing at a very rapid rate. What is mitigatable now is not what was mitigatable 10 years ago. That sounds like time is favorable. The passage of time is something that would be favorable to you. You need a new technology to somehow come along for you to be able to develop these minerals. Possibly, Your Honor. But Appellant's site, that's the sidestep in the court's order. They short-circuited that process. There was no opportunity to look to see if there might be mitigatable. There's plenty of it. I mean, all this time has gone by, and it wasn't as though Solomites was walled off from the process. There were, as you show, lots of communications back and forth. I'm just trying to understand how they would have thought, what they would have thought would have been left of the lease if these determinations, which were very much about can we extract minerals in this area consistent with environmental and cultural and tribal religious practices. And that was very much in doubt. I'm trying to understand how there could be a separate thing, but I'll still have my lease, and the lease is to get the minerals that they said you can't get. Yes, the APD wall, yes, that was in question. That was the debate for a very long time. But again, that doesn't affect the actual validity of the underlying lease. How do I know that? Because the whole point of the lease is it's a lease for mineral. It's not as though you could put up a house there. The lease is just to extract minerals. And that's why they had to keep suspending the lease because you'd have to, as I understand it, you would have had to keep paying rents and royalties on extracted minerals. So if they've been saying for sort of year after year after year for a couple decades that we're not sure we're going to be able to, we're still deciding whether we can get minerals out of here or not. I think it's important looking back through. What's left of the lease. So looking back at the history of this case, I think it's important to recognize that the APD was approved on four separate occasions. Solnex had every reason to believe that once this process ran its course that they would be able to develop. There was no indication from the agencies that they wouldn't be able to do so. Solnex was in contact with the agency throughout this process. There were communications back and forth. Yeah, to a certain extent, yes. So this was both statements directly to Solnex when Sidney Longwell asked specifically, is my lease still valid after he obtained the lease again from FINA? And the agency explicitly told him, yes, you have a valid lease. And that is, again, in 2003 with the approval of the oil pipeline project for the same area. Again, there was no indication that there was environmental impacts or historical impacts at all. So I think while the actual ability to drill on that land was somewhat in question, it was open to certain mitigation efforts, the actual ownership of the lease was never called into question. And Solnex had a reasonable expectation that this process would continue on until reaching a decision that they would be allowed to develop the lease. District Court mentioned the reliance interest. What was the evidence of reliance interest that you put forward? Well, there's not great evidence of reliance in the record itself. Again, because the agency abruptly switched its decision, there was no opportunity. They never asked what our reliance interests were. And I think that goes into – In your motion for summary judgment, I mean, there's no rationale for the court to raise a the government didn't address reliance interest unless you made an argument like that or unless you offered something to suggest a reliance interest. So that's why I'm asking. What was the reliance interest that would prompt the court to rely on a failure to address the reliance interest? Reliance interest, again, based off of the affirmations over the years, Solnex reacquired the lease and took on FEMA's obligations. Talking in general theory isn't, again, what I'm asking for. So the only thing I see is the declaration of Mr. Longwell in support of the motion for summary judgment. And the only thing he mentions in that is that he spent over $35,000. That's it, nothing else. And the government agreed to pay approximately $35,000. So what reliance interest is the court relying on for saying the government was wrong? Well, throughout the, after that point, there was all through the Section 106 process, which required Solnex to send representatives to attend those meetings, there were travel costs and time costs, a series of different things they spent, as well as there was the expenses of Solnex's predecessors and interests. Those are all reliance interests. None of those are mentioned in the declaration, and none of those seem to be mentioned anywhere. So, you know, we've said in the Mingo case that you need very specific, if you're going to rely on reliance, you need very specific affirmations about reliance. And the only, I'm asking, is there another place that you can point me other than to this $35,000 number? No, Your Honor, and that's because, I guess, look, under State Farm, the Factor 2, the agencies entirely failed to consider the possibility that Solnex may have reliance interests. But they didn't. They paid $35,000. They agreed to pay $35,000. That seems like a very direct response to the question of reliance. I would understand an argument that they didn't address it at all, but they did, and they particularly also mentioned that because it had never been developed, the status quo was not altered. Lease payments totaling $31,235 were made. Our cancellation entitles Solnex to a refund of that amount. So they addressed what appears to be the only specific claim of reliance raised either before the agency or in the district court. That's what I'm asking, but there doesn't appear to be anything else. No, Your Honor. Okay. So in addition to acting outside of their authority, and this is the violation due to that, the cancellation is also arbitrary and capricious before, again, the reason I just stated is failure to consider Solnex's reliance interests, but also because this decision represents an abrupt and unexplained departure from agency precedent, and we see that from the Texas oil case and the Association of Data Processing Organizations cases, that when an agency acts a certain way explicitly over a very long period of time and then suddenly reverses without any real explanation for why, that is arbitrary and capricious. So, like I said, we see that. Your Honor, again, I'm trying to figure out the sudden switch here because they were studying and working through this can minerals be developed on this land all along, almost from the get-go, and then you had intervening decision from this court, from the Ninth Circuit, the two courts that would cover this territory, and then intervening congressional legislation. So with all that going on and them continuing to study and investigate whether they complied with NEPA undertaking more environmental studies, undertaking more NHPA studies, obtaining more information about the cultural value, it doesn't feel to me like a switch. I'm having trouble understanding that argument. Well, throughout this whole process, the actual question of lease validity, as the intervener stated, was raised by the Blackfeet, and the agencies explicitly rejected that argument. They explicitly stated, no, we believe that NEPA and NHPA. Well, in 1993, they said it hasn't yet been invalidated administratively or judicially, and that's very different than saying when there's administrative processes ongoing, that that could not be a possible outcome. I disagree, Your Honor. Over and over again, you see this in 1987, in 1991, in 1993, explicitly stating that Connor v. Burford factors were met in this case and that they did not see value in those arguments. And then you see throughout the process, continuing the hearings on suspension and all the process, if the lease was invalid in 1982, then there was no reason to do any of this. The lease should have been canceled at the outset of the process. Not only did the agencies fail to do that, but appellants actively disagreed with that assessment. Well, it says, Simon J. 1284, in responding to the Connor thing, the Connor case, this lease has not been challenged by administrative appeal or in federal district court, right, but has been raised during the scoping process for an EIS. And then he says, I have no authority to cancel or change the lease, but that doesn't mean. . . And my understanding is that the validity of the lease was raised in the National Wildlife Federation complaint back in the early 90s, after the 1993 decision. So it seems like that wasn't a, you're rock solid on this lease. It was, there's an issue, it hasn't yet been challenged administratively or in federal district court, and then there's a federal district court case that challenged, included amongst those challenges, the validity of the lease. Okay, I think that's, the agency's recognizing that that question has come up, but whenever the agency was asked to say. . . That's a little different than saying we have definitively decided that somehow Connor, our case doesn't apply to this thing just because it hasn't yet happened and I don't have the authority to cancel the lease on my own. That's a little different. Yeah, I believe in the 1993 record of decision, which I believe was stated as a final agency action, in that situation they did affirmatively state that. . . Well, that's what I was just reading from. Right. That's what I was just reading from. They didn't affirmatively state. They just said as of now, no one's challenged it. And the secretary, or whoever was writing the record of decisions, said I don't have the authority unilaterally to cancel the lease. Correct, Your Honor. They don't have the authority to unilaterally cancel the lease. All right, further questions? Thank you. Thank you. Is there time remaining? We'll give you another two minutes and we'll let him have three over. Thank you. A couple of quick points. First, on past statements by the agencies about compliance with NEPA and the NHPA, even, I mean, I agree with Judge Millett with her characterization of the statements. It's not definitively taking a position that, you know, conclusively these statutes were satisfied here. But even if you take my friend at his word that that's what they meant, those statements meant, the agency's entitled to take a reassessment of its legal risks, and it can do that under the FOX TV line of cases, so long as it first acknowledges that it's changing position, which it did here, and it expressly acknowledged those past statements at pages 337 and 338 of the joint appendix. That's the secretary's cancellation decision. And so long as the secretary provides good reasons for the new position, and FOX TV makes clear that those reasons don't have to be necessarily better than the prior reasons, the agency just has to believe they're better, and that's acknowledged by the change in position, by acknowledging the change in position demonstrates that the agency believed them to be better. The panel's also correct in observing that, and I believe it was Judge Millett, your observation, that the legal validity of this lease has been in question for decades. It was never fully resolved by a court. The National Wildlife Federation case was... Well, that's sort of the problem. It was, as you've said, implicitly, but it's not clear to me how explicitly they were on notice about the lease cancellation, risk of lease cancellation. You said they go hand-in-hand, but then they say no. I assume they're here fighting, because I think there's still some value to the lease, even if they can't develop the minerals, and I'm just a bit confused. So I think the best... Do you think better technology would come along? I don't know that that's the case. I think the best way to link the APD, the Permission to Drill, with the original lease issuance is to understand that these legal defects that the court found in Sierra Club against Peterson and Connor against Burford were defects at the original leasing stage, and the question was whether the agency could cure those at the subsequent stage when it processed the application for Permit to Drill. So I think because the case law says this is a defect in the timing of how you first issued the lease with only an EA and only later did an EIS at the drilling permit stage, that everybody reasonably understood we were talking about NEPA compliance at both stages. What would have happened if you had just said applications for drilling denied? We just don't see absent material change in circumstances. There's not going to be any authority to extract minerals from this area. But you didn't cancel the lease. What would then happen? So presumably the suspension would lift and the obligation for the lessee to pay rents would kick in. They'd start having to pay annual rents. They'd have the remainder of the lease term, which as I understand it, may be something on the order of three years have expired, say, in the lease. I'm just going from memory here. And maybe they'd have another seven years to submit a new application for Permission to Drill and somehow demonstrate that they have satisfied all the cultural concerns. But given the Secretary's finding on the cultural issues, I just don't see how they could practically do that. For all these reasons, we'd ask you to reverse the district court. You're talking about the page number? Yes. Yes? In response to Judge McMillan's question, I had given the court the citation JA1136. The document I intended to reference was JA2185. That's the document from 1987. The other one is an early 1990s document. Sorry for any confusion. Thank you. Thank you for correction. All right. We'll take the matter under submission.
judges: Garland, Tatel, Millett